THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JERRY L. SALVATOR, JR., Defendant-Appellee.

Fourth District    No. 4—92—0293

Opinion filed November 5, 1992.

Thomas J. Brown, State's Attorney, of Pontiac (Norbert J. Goetten, Robert J. Biderman, and Dale M. Wood, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Carey J. Luckman, of Pontiac, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In October 1991, the State charged defendant, Jerry L. Salvator, Jr., with the offense of possession of controlled substances (less than 15 grams of a substance containing cocaine) (Ill. Rev. Stat. 1991, ch. 56½, par. 1402(c)). In January 1992, defendant filed a motion to suppress the evidence which was the basis of the charge against him. In March 1992, the trial court conducted a hearing on that motion and granted it. The State appeals.

We reverse.

## I. BACKGROUND

Livingston County deputy sheriff Jason M. Brainard was the only witness to testify at the March 1992 hearing on defendant's motion to suppress. He testified as follows. On the evening of October 16, 1991, while on routine patrol, Brainard came upon a small, white vehicle traveling toward him on a two-lane road. Despite the dotted line that ran down the middle of the road, the car weaved into his lane for approximately one quarter of its width and then swerved back. Brainard turned his police car around to follow the white car.

As the white car reached a stop sign intersection in the town of Saunemin, the car did not come to a full and complete stop; instead it "roll[ed] through" the stop sign. Brainard continued to follow the car for approximately one mile and noticed the car weave two or three times more over the centerline, as well as weave over the right shoulder. At that point, he stopped the car to investigate a possible DUI (driving while under the influence of alcohol). When Brainard activated his overhead red and blue lights, the white car pulled off the roadway.

Brainard approached the driver's side of the car and asked the driver to produce his driver's license. Brainard first spoke to the driver through the driver's side window, which was rolled down only an inch and a half. In order to better communicate, Brainard asked the driver to roll the window down the rest of the way, which Brainard described as the usual procedure followed by drivers whom he has stopped. The driver did so and produced his driver's license.

When the window had been rolled down, Brainard smelled "a strong odor of burning cocaine." When asked to explain his familiarity with that odor, Brainard testified as follows:

"A. I worked at the Pontiac Correctional Center. At the time I was there, I, during shakedowns, several times, I would come across the smell of either burning cannabis, burning cocaine. That officer that made the arrest on that [basis] would have [the substance] tested at the Armory. *** [I]t is a smell that you don't forget. It has got a unique smell to it.

Q. [Defense counsel]: Can you describe it a little bit?

A. No, sir; I can't. It is not like anything I have ever smelled before.

[Brainard added at a later point in his testimony that there were two or three occasions when he saw a burning substance removed from a cell at the Pontiac Correctional Center which he was later informed was tested and determined to be cocaine.]

Q. Okay. So what did you do when you detected that odor?

A. I became initially curious as to why it was emitting from the vehicle."

Brainard typically runs a check on all occupants of vehicles that he stops, so he also asked the passenger in the front seat for some identification. The vehicle contained three people: defendant, who was the passenger in the right front seat; another adult male, Richard Bigger, who was the driver; and Richard Bigger's young daughter, who was seated in the back seat. After defendant produced his identification, Brainard returned to his police car to ask his department if there were any warrants outstanding for either Bigger or defendant or if the white car was stolen. The sheriff's department responded negatively to all inquires.

While Brainard was speaking to the sheriff's department, Illinois State Trooper Neumann pulled up behind Brainard's police car. Brainard explained that he did not request any backup, but that an officer's providing backup "is a common courtesy" that all police officers appreciate. Brainard advised Neumann about the nature of the stop, what he had smelled in the car. He then asked Bigger to submit to a field test for DUI. Bigger took the field test and passed it.

As Brainard conversed with Neumann at the police car, Brainard looked "back to the vehicle at one point, and I did see [defendant] making a movement in the passenger seat which indicated to me that there was—it was unusual for that movement to be made for a stop." Brainard tried both to describe the movement he saw and to demon-

strate it on the witness stand. The trial court described Brainard's motion on the stand as shrugging his shoulders up and down and pushing them back against the witness chair. When asked if the motion he observed was "kind of like somebody stretching," Brainard stated the following: "No. What it appeared to me, is somebody placing something either in the seat area or the passenger area of the car."

Brainard described the white car as a small hatchback vehicle. He explained that when he observed defendant make the motion he described, the interior of the vehicle was very well illuminated by both his headlights and his spotlight. When Brainard saw defendant's shoulder movements, he was not able to see defendant's hands.

Trooper Neumann operates a State Police "K-9 Unit," which means that he had a police dog in his squad car. Shortly after Brainard and Neumann conversed, Neumann took the dog out of his squad car and had it walk around the outside of the white car. The dog began barking and scratching at the back of the car. When the dog behaved in that fashion, Bigger was asked if there was any contraband in the car and for permission to search it. He told them that if they "want to look in the trunk, you can; go ahead." Bigger indicated that he just wanted to get home.

Meanwhile, another police officer, State Police Sergeant Snyders, also arrived at the scene, and one of the officers contacted someone from the State's Attorney's office. Neumann told Brainard that the State's Attorney's office was informed that "[t]he dog had acted in a manner positive to drug indication." Brainard did not participate in the conversation, but understood that the officers were trying to get an opinion from the State's Attorney's office on how they should proceed.

At that point, the officers ordered the occupants to step out of the vehicle. They complied, and Brainard took Bigger's daughter from the back seat to his squad car so she would not get cold. After Bigger got out of the car, Neumann found a small bottle of whiskey, not previously visible, that was in the driver's area of the car. Neumann bent into the car and picked it up.

Brainard then conducted a "pat-down search" of the occupants of the vehicle. He explained his reasons for doing so as follows:

"I [did] it—my sole reason for doing [it] is[—]was[—]for protection. I have had people come out of the vehicle—they have had either a gun on them or a knife. It is for my safety as well as the safety of other officers."

Brainard conceded that neither defendant nor Bigger had made any aggressive movements or gestures, nor had Brainard seen any weapon or a suggestion of a weapon. He explained that he was "just being careful for officers' safety."

Brainard used what he called a "standard pat-down" on defendant, which he explained as "patting down what areas that we feel would be probable to hide a weapon[,] starting with the waistband." When asked if he would go "into things like pockets on trousers," Brainard explained that he would feel over them. He explained his pat-down procedure as follows:

"A. I felt first around the waistband, felt a bulge just right at the beltline, below the belt line of the pants, and I felt a bulge in one of the pockets.

[Defense counsel]: Q. Now, did these bulges feel like hard objects?

A. Yes.

Q. How large did they feel as you—

A. The one in the crotch area felt large enough for a knife or a gun.

Q. Now was [defendant] wearing a jacket or a coat or anything?

A. I believe he was just wearing a T-shirt.
* * *
Q. So tell us what you did when you found these bulges?

A. I removed the one at the waistband. [It] was there just at the—right below the beltline of the pants.

Q. So you reached into his pants?

A. No, I took my thumb inside to feel what it was.

Q. Okay.

A. I didn't probe my fingers in his pants, no.

Q. You stuck your thumb inside?

A. Yes, just ran it around the inside of the beltline.

Q. What did you find?

A. I found a little—like it was a Marlboro cigarette box, and pulled it out.

Q. Um-hmm.

A. It seemed unusual to have that in that area.

Q. So what did you do when you pulled out the Marlboro cigarette box? Did you open it?

A. Yes, I did.

Q. What did you find inside it?

A. A little—like a saran wrap or a piece of cellophane with some substance in it."

The substance Brainard found in the cellophane was later tested and found to contain cocaine. Brainard further described the cigarette box in which it was found as a "flip-top box." That substance provided the basis for the charge the State brought in this case against defendant.

Brainard testified that after he found the cigarette box, he did the following:

"A. [I] [t]hen patted down the crotch area and felt something like either a knife or a gun. It was very large and hard. So I had him put his hands on the car. It didn't seem natural to be in that area. *** My first indication was that it was a weapon. It was unusual to find something that big in that area. *** [I] [h]ad him place his hands on the car. After that point, we had that item removed. It was a piece of cloth like a wash cloth, a face cloth, with what I call a pipe, commonly referred to as a pipe."

Brainard described the pipe as five to six inches long.

Brainard never obtained a search warrant to search the white car nor did he ever write any traffic citations against Bigger.

At one point during Brainard's testimony, the prosecutor asked him the following question:

"Q. So based upon the odor that you detected and the movements that you had seen from the passenger and the manner in which the dog reacted, you had the individuals get out of the car?

A. Yes, sir."

The prosecutor then asked Brainard to explain again why he conducted a "pat-down" of defendant, and Brainard responded as follows: "Mainly for weapons. That is my main concern when pulling somebody out of a car for a reason. Plus, the fact that I had smelled the odor, the way the dog acted."

When asked what he was looking for when he opened the cigarette box, Brainard replied:

"For weapons. Anything can be hidden in a cigarette pack. *** It is unusual to find a cigarette pack shoved in front inside the beltline. It is very unusual. It could have been a razor blade. It could have been anything."

After the attorneys concluded their direct and cross-examinations of Brainard, the trial court itself questioned Brainard as follows:

"[THE COURT:] Q. My next question is when you go to police training or any of the training you get, has anyone ever suggested when you think you have probable cause to search a car *** and there is no consent, that you can ask a judge for a search warrant?

A. Yes, sir.

Q. Okay. Have you at any time in the past year and a half ever been involved in a request of a judge for a search warrant on a car?

A. No, sir.

Q. Do you know of anybody in your department who has ever asked a court to issue a search warrant on a car?

A. No, sir."

Defendant called Brainard as the only witness on his motion to suppress. Once defense counsel indicated that he did not intend to call any other witnesses, the trial court, without hearing any argument from counsel, found that defendant had established a *prima facie* in support of his motion, explaining as follows:

"The evidence thus [far] is that there was no *** search warrant. The court finds the defense has established a prima facie case based upon there was no arrest of the driver. There was nothing in plain view. There is apparently a dispute as to whether consent was given. Understanding that the court must look to the totality of the circumstances to determine whether consent was voluntary, and what established 'consent,' [t]here does appear to be an articulable reason by the officer from the smell of burned cocaine in the car to search. But in lieu of the other exceptions to obtaining a warrant, the issue may well in this case boil down to whether the officer was required to have a court review the officer's belief that he had probable cause for the search, as opposed to simply proceeding to search. *** [I think the law] *** is still that *** you go before a magistrate or judge and you get a warrant unless you have exigent circumstances, some kind of an emergency. The only emergency I envision [on the evening in question] *** is that you have a small child [and a] chilly night. The child is back in a police car. *** But it seems to me that the burden at this point now shifts to the State to demonstrate, which is what the test is, why a search warrant should not have been obtained and why a warrantless search should be made, understanding that the State is arguing that there was consent.

[The prosecutor]: The only thing that I would point out is contraband was not found in the vehicle. The contraband was found on an individual who the officer testified to prior to the pat-down, he had observed him making—[a furtive movement]."

In response to the prosecutor's statement, the trial court stated the following:

"I don't know if that [was] a furtive movement or not. But I am not suggesting that the officer did not have an articulable reason to search the car from the cocaine smell. The only question, to me, in this case is whether when there may have been an issue as to consent given, it appears that virtually none of the other exceptions apply to obtaining a warrant, because that is all the law says. ***

[The prosecutor]: Maybe I am missing something, but to me, the question is was there a cause to pat-down and search the passenger of the vehicle.
***

THE COURT: Well, that may also be an issue ***."

The court then addressed the "pat-down" issue further with the prosecutor as follows:

"Can you pat-down anybody anytime you make a traffic stop. Can you get them out of the car, everybody in the car, pat them down for weapons or contraband?

[The prosecutor]: I guess my interpretation would be a little different. I guess could you pat someone down if you smelled the odor of burning cocaine in a vehicle and observed a passenger making movements that may be consistent with someone concealing contraband or a weapon somewhere on his person, in the vehicle, or somewhere in close proximity to himself."

After a brief recess, the prosecutor informed the court that the State had no evidence to present beyond the testimony of Deputy Brainard. The trial court then listened to further arguments, with defendant essentially arguing that everything the police did, beginning with the stop of Bigger's automobile, was illegal and improper. In response, the prosecutor argued as follows:

"I don't think we are arguing about a vehicle search here. I think the question is whether or not the officer had justification for searching [defendant] that evening, the pat-down search that he conducted. And I would submit that he did based upon the odor of cocaine that he has testified to, based upon the actions of the dog outside the vehicle, and also based upon the movement that he has described [defendant] as making prior to

[defendant's] being asked to step from the vehicle. I think those factors considered in their totality gave him justification for the pat-down during which the contraband was found. So I would ask that the motion be denied."

When making its findings, the trial court continued to address issues that had no relevance to the seizure of the cocaine—which provided the basis of the charge against defendant—from the cigarette flip-top box taken from defendant's waistband. The court concluded that Bigger did not give voluntary consent to have his car searched. Then the court noted that no contraband was in plain view in the white car nor did the police conduct an inventory search of it. The court then found no exception present "to the rule that they have to obtain a search warrant before searching a car." In the course of the trial court's findings, it made the following observations:

"[T]he officer who is making the stop of the vehicle can frisk presumably the driver for weapons, at least that is the person who articulably they were stopping, unless [the officer] had seen the passenger doing something that caused the stop. In this case, nothing the passenger did caused the stop. It was the driver's conduct."

Despite its earlier findings critical of the police officers, the trial court nonetheless made the following curious observation:

"[W]hat we have in this case is none of the exceptions [to the rule that police should get a search warrant before searching a vehicle]. Does that mean that the officer, however, could not have obtained a search warrant? I think he probably could have. Because I think [he testified] he smelled the odor of cocaine, and [saw] what he thought was an unusual movement *** ."

The trial court concluded its initial holding as follows: "The officers should *** have applied for a search warrant. They did not do so. Therefore, I am ruling that the search without a warrant was invalid." At one point in its ruling, the court explained that it doubted the grounds were present authorizing the police to order the occupants of the car other than the driver to get out of the car. The court suggested that a search warrant might be necessary before the police could take that action.

The prosecutor then asked the court to specifically address the question of the officer's claim of justification for the pat-down of defendant on the basis of the officers' safety. The trial court responded as follows:

"There have been no movements of any kind by the occupants to give any type of articulable suspicion that there may be a weapon or they may be planning to harm someone. This, in my opinion, is a curiosity pat-down for contraband, and really not for a weapon. I don't find that the record can establish that based upon these facts, that the officer was truly searching for a weapon. I think in my evaluation of the testimony, he was searching for drugs. He was searching for contraband. Nothing had been done by anybody in that car to give any indication there was a weapon. And what he found is what I think he was looking for. He found the pipe *** down in the bulge area. *** I don't think from the testimony it did resemble a weapon. Certainly, the Marlboro box was not a weapon. So, no, I find there is no *probable cause* under these circumstances to search the defendant under these circumstances. I find there is no *probable cause* to search him. Now, when I say that[—]no *probable cause* without a warrant, a warrantless search[—]I mean, we're still back to where we were. The officer may have been able to articulate reasons based upon the smell, based upon what he thought was a furtive movement to not only search the car, but to continue that search to the occupants. ***

\* \* \*

I mean, if you say that you can pat-down under any circumstances, I don't think that is what the law says yet. May be coming. *So I think there was an articulable reason to get a search warrant for the vehicle,* and in that process also to pat him down because of the smell of cocaine and the stretching movements, the bulge maybe in the pants; but it couldn't have been a weapon. And in my opinion what we are really searching for is drugs. *And a search warrant could have been obtained.*" (Emphasis added.)

We emphasize certain portions of the trial court's findings and remarks because they are (1) frequently internally inconsistent, (2) wrong on the applicable law, and (3) irrelevant to the issues properly before the court.

## II. Analysis

In *People v. Ricksy* (1990), 206 Ill. App. 3d 302, 564 N.E.2d 256, this court addressed the lawfulness of police conduct in seizing a small packet of a substance containing cocaine during a "stop and frisk" pat-down. In *Ricksy,* we wrote the following:

"We suggest the following analytical approach for trial courts to use when deciding motions to suppress evidence. When, as here, the evidence before the court reveals a series of interactions between the police and a person who is being stopped or searched, the court's analysis should be as finely divided as possible to distinguish among the various stages of that interaction.

Using the present case as an example, the evidence presented at the hearing on the motion to suppress raised the following distinctive questions: (1) Was the initial stop of the [defendant's automobile] lawful? (2) Assuming the initial stop to be lawful, did the officer lawfully order the passengers to get out and to stand at the rear of the vehicle? (3) Assuming that order was lawful, did the officer lawfully conduct a pat-down of the defendant? And (4) assuming the pat-down was lawful, did the officer lawfully remove the envelope from defendant's pants pocket?

At the conclusion of the evidence and before counsel began their arguments on the motion [to suppress], had the court framed the issues before it in this fashion, both the trial court and this court could have received clear statements as to what the parties' respective positions were on these issues. An additional benefit would be that each counsel would argue the facts and law counsel deemed supportive. The last advantage of utilizing this procedure would be that the trial court, when complying with the requirements of section 114—12(e) of the Code [(Ill. Rev. Stat. 1989, ch. 38, par. 114—12(e))], could state with specificity its findings of fact with regard to each of these separate questions, as well as its conclusions of law based thereon." *Ricksy*, 206 Ill. App. 3d at 306-07, 564 N.E.2d at 259.

The present case perfectly demonstrates the need for trial courts to follow the analytical steps suggested in *Ricksy*. The hearing on defendant's motion to suppress should have focused on the lawfulness of the seizure of the substance containing cocaine which Brainard found in the cigarette flip-top box he seized from defendant's waistband. That substance provided the only basis of the charge against defendant. The trial court should have conducted the hearing on defendant's motion to suppress by carefully analyzing on "as finely [a] divided [basis] as possible" (*Ricksy*, 206 Ill. App. 3d at 307, 564 N.E.2d at 259) the various stages of the interactions between the police and defendant in this case that led to Brainard's seizure of that evidence.

Unfortunately, because of the trial court's failure to analyze the issues in this fashion, at one time or another during its findings it addressed the following *irrelevant* search and seizure issues: (1) Bigger's consent to search the car; (2) the applicability of the plain view doctrine to seize items found in the car; (3) whether the police could have conducted an inventory search of the car; (4) whether the police should have obtained a search warrant; (5) whether the police could have obtained a search warrant; (6) whether the Livingston County sheriff's department trains its deputies to seek search warrants for cars when they think they have sufficient probable cause to authorize a judge to issue a search warrant; (7) whether the particular deputy sheriff involved in the present case had ever sought a search warrant for a car; and (8) whether the police properly searched incident to arrest.

Following the analytical approach we suggested in *Ricksy*, we conclude that the evidence presented at the hearing on defendant's motion to suppress raised the following distinctive questions: (1) Did the deputy sheriff lawfully stop the white car? (2) Assuming that stop was lawful, did the deputy lawfully order the passengers to get out of the car? (3) Assuming that order was lawful, did the deputy lawfully conduct a pat-down search of defendant? (4) Assuming the pat-down was lawful, did the deputy lawfully remove the cigarette flip-top box from defendant's waistband? And (5) assuming the deputy lawfully removed that box, did the deputy lawfully open it and seize its contents? We will analyze these five issues in turn.

### A. Did the Deputy Lawfully Stop the White Car?

Brainard testified that he observed the white car weave two or three times outside the lane in which it was traveling. He also observed the car "roll" through a stop sign. At that point, Brainard believed that the car was a road hazard and that he had enough reason to stop it to find out if the driver's ability to drive was impaired because of alcohol or drugs.

Defendant argues that Brainard's stop of the vehicle in which defendant was a passenger "was not a valid investigatory stop [because] it was not based upon specific and articulable facts sufficient to reasonably warrant that intrusion." Defendant also argues that Brainard's stop of the white vehicle was a mere pretext. We disagree.

■ Assuming for purposes of this analysis that defendant, who was a passenger in the white car at the time of the stop, has standing to challenge Brainard's stop of that vehicle, we hold that the evidence

presented sufficiently justified Brainard's action in doing so. In support of his pretext argument, defendant cites *United States v. Trigg* (7th Cir. 1989), 878 F.2d 1037. However, we reject as being without any basis in fact defendant's argument that Brainard's stop was a pretext. We further note that *Trigg* provides no support for defendant's argument and in fact casts doubt on the notion that pretext can ever be the basis for a motion to suppress. In *Trigg,* the court wrote the following:

> "[W]e believe that the reasonableness of an arrest depends upon the existence of two objective factors. First, did the arresting officer have probable cause to believe that the defendant had committed or was committing an offense. Second, was the arresting officer authorized by state and or municipal law to effect a custodial arrest for the particular offense. If these two factors are present, we believe that an arrest is necessarily reasonable under the fourth amendment. This proposition may be stated in another way: so long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional. *See United States v. Causey,* 834 F.2d 1179, 1182 (5th Cir. 1987) *(en banc).*" *Trigg,* 878 F.2d at 1041.

We reaffirm the holding of this court in *People v. Sorrells* (1991), 209 Ill. App. 3d 1064, 1069, 568 N.E.2d 497, 500, in which we held that

> "an objectively reasonable stop or other seizure is not invalid simply because the officer acted out of an improper or dual motivation. [Citations.] Whether a fourth amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time and not on the officer's actual state of mind at the time the challenged action was taken."

We also reaffirm what this court recently wrote in *People v. Flores* (1992), 231 Ill. App. 3d 813, 823, 596 N.E.2d 1204, 1211, quoting *Garcia v. Texas* (Tex. Crim. App. 1992), 827 S.W.2d 937, 942:

> " '[W]here police officers are objectively doing what they are legally authorized to do ... the results of their investigations are not to be called in question on the basis of any subjective intent with which they acted[.]' "

In *People v. Houldridge* (1983), 117 Ill. App. 3d 1059, 1062, 454 N.E.2d 769, 771-72, this court also wrote the following:

> "Generally, a police officer may briefly detain an individual where the officer believes on the basis of articulable facts that

there is a substantial possibility that that individual has committed, is committing, or is about to commit a criminal offense. [Citations.] More specifically, erratic driving, such as weaving across a roadway or even weaving within the lane of traffic within which a vehicle is traveling, provides a sufficient basis for an investigatory stop of a motor vehicle."

Finally, in *People v. Loucks* (1985), 135 Ill. App. 3d 530, 533, 481 N.E.2d 1086, 1087, the court cited *Houldridge* and held that "[w]eaving within the lane of traffic in which a vehicle is traveling provides a sufficient basis for an investigatory stop of a motor vehicle." Based upon the foregoing authority, we conclude that Brainard lawfully stopped the white car.

### B. *Did the Deputy Lawfully Order the Occupants of the Vehicle To Get Out?*

At the time that Brainard ordered defendant and the other occupants of the white car to get out of the car, the following events had occurred: (1) Brainard had smelled the "distinct" smell of burning cocaine coming from the interior of the car; (2) the State police dog had given indications that some contraband was located in the rear of the car; and (3) Brainard had observed what he described as a "furtive movement" by defendant as he sat in the front passenger seat of the white car while Brainard and Trooper Neumann were conversing. In *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 109-11, 54 L. Ed. 2d 331, 336-37, 98 S. Ct. 330, 332-33, the United States Supreme Court addressed the question of the authority of a police officer who, as here, has lawfully stopped a vehicle to order the driver to get out of the car, and the Court wrote the following:

> "[The first issue we need address is] the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle or from the later 'pat down,' but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped.
>
> Placing the question in this narrowed frame, we look first to that side of the balance which bears the officer's interest in taking the action that he did. The State freely concedes the officer had *no reason to suspect foul play* from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior. *It was apparently his*

*practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation.* The State argues that this practice was adopted as a precautionary measure to afford a degree of protection to the officer and that it may be justified on that ground. Establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault.

*We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty.* 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' [Citation.] And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. [Citation.]' [Citation.] We are aware that not all these assaults occur when issuing traffic summons, but *we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations.* \* \* \*
\* \* \*

Against this important interest we are asked to weigh the intrusion into the driver's personal liberty occasioned not by the initial stop of the vehicle, which was admittedly justified, but by the order to get out of the car. *We think this additional intrusion can only be described as de minimis.* The driver is being asked to expose to view very little more of his person than is already exposed. *The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it.* Not only is the insistence of the police on the latter choice not a 'serious intrusion upon the sanctity of the person,' but it hardly rises to the level of a ' "petty indignity." ' [Citation.] *What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."* (Emphasis added.)

Thus, *Mimms* stands for the proposition that the police officer who has made an otherwise lawful stop of a vehicle may—*without more*—order the driver to get out of the car. However, defendant in the present case was a *passenger*, not the driver, of the stopped vehi-

cle. The question then arises whether *Mimms* authorizes the police to order the passenger out as well. Professor Wayne LaFave addresses this question in his treatise on the fourth amendment:

> "The courts are not in agreement as to whether the *Mimms* reasoning also applies to a passenger in a stopped vehicle. On the one hand, it has been concluded that 'the *Mimms* analysis would seem also to justify a policy of ordering passengers out,' in that 'the same concern of the officers for their own safety applies, and the intrusion on the rights of the passengers occasioned by being required to get out of the car is no greater than the intrusion on the rights of the driver.' On the other, the conclusion 'that the *Mimms* rationale does not extend to passengers in the automobile' is based upon the fact that the passenger 'has broken no law and *** may walk away from the scene unless the police officer has some other legitimate reason to detain him,' and the conclusion that 'the passenger has a higher expectation of privacy than the driver because the passenger plays no part in the routine traffic infraction and has reason to suppose that any exchange with the authorities will be conducted by the driver alone.'" 2 W. LaFave, Search & Seizure §5.2(h), at 469 (2d ed. 1987).

■ We find more persuasive the analysis that holds that the same concerns of the officers for their safety that justify a policy regarding the driver similarly justify ordering the passenger to get out of the vehicle. Accordingly, we hold that a police officer may lawfully order the passenger in a vehicle the officer has lawfully stopped to get out of the vehicle. In so holding, we find unpersuasive the argument that the passenger has broken no law and may walk away from the scene unless the police officer has some other legitimate reason to detain him. That is not in fact what occurred in this case, and we further doubt that it occurs in very many cases. Instead, the passenger here—defendant—stayed in the stopped vehicle until told to get out. Defendant never expressed any desire to walk away from the scene. If and when that unusual case arises—when the passenger gets out of the stopped car of his own volition and proceeds to walk away—we will then address the authority of the police to detain the passenger at the scene.

#### C. *Did the Deputy Lawfully Pat-Down Defendant?*

In *People v. Smith* (1992), 224 Ill. App. 3d 511, 515, 586 N.E.2d 785, 788, the court held that "[t]he right to frisk does not automatically follow the right to stop." Accordingly, even though we have held

that Brainard lawfully (1) stopped the white car, and (2) ordered its occupants to get out, we must still determine whether he had lawful authority to frisk or pat-down defendant—we use those terms interchangeably because they mean the same thing—after he got out of the car.

■ Brainard testified that he performed the pat-down of defendant because he was concerned that defendant might have a weapon on his person. He based his concerns on (1) the smell of burning cocaine from the interior of the car—a smell he claimed to recognize well—(2) the way the police dog acted around the car, and (3) the furtive movements of defendant while seated in the car. We hold that these circumstances justified Brainard's pat-down of defendant.

In *People v. Stout* (1985), 106 Ill. 2d 77, 477 N.E.2d 498, a police officer testified that he detected the odor of burning cannabis in a vehicle he had just stopped for a traffic violation. Without any further basis, he searched the interior of that car and found a vial of cocaine. On motion of the defendant, the trial court suppressed the cocaine on the ground that the odor of cannabis coming from defendant's vehicle did not give the arresting officer sufficient probable cause to conduct a warrantless search. (*Stout*, 106 Ill. 2d at 81-82, 477 N.E.2d at 500.) The appellate court affirmed the order of suppression, but the supreme court reversed and wrote the following:

> "Police officers often must act upon a quick appraisal of the data before them, and the reasonableness of their conduct must be judged on the basis of their responsibility to prevent crime and to catch criminals.
>    ***
>
> This court has held that distinctive odors can be persuasive evidence of probable cause. A police officer's detection of controlled substances by their smell has been held to be a permissible method of establishing probable cause. ***
>
> *** Based on the particular facts of this case, including the officer's experience and training in the detection of controlled substances, we find that probable cause existed to justify the warrantless search.
>
> Just as this court has never defined the quantum of knowledge necessary for the admissibility of expert witness testimony, this court will not bite at the defendant's lure to define the exact number of training hours or employment years necessary to render an officer's belief reliable. As stated earlier, what constitutes probable cause for searches and seizures must be determined from the standpoint of the officer, with *his skill*

*and knowledge* being taken into account, and the subsequent credibility determinations must be made by the trial court." (Emphasis in original.) *Stout*, 106 Ill. 2d at 86-87, 477 N.E.2d at 502-03.

In *Houldridge*, this court agreed with the "great majority" of courts of other jurisdictions that "the odor of marijuana smoke, standing alone, provides probable cause for a warrantless search of an automobile, at least where the officer who smells the marijuana is experienced in the detection of such odors." (*Houldridge*, 117 Ill. App. 3d at 1063, 454 N.E.2d at 772.) We note that the supreme court of Illinois has also written that " 'if circumstances reasonably indicate that the police may be dealing, not with an ordinary traffic violator, but with a criminal, then a search of the driver and his vehicle is authorized in order to insure the safety of the police officers and to prevent an escape.' " *People v. Palmer* (1976), 62 Ill. 2d 261, 264, 342 N.E.2d 353, 354, quoting *People v. Brown* (1967), 38 Ill. 2d 353, 355, 231 N.E.2d 577, 578.

In *People v. Day* (1990), 202 Ill. App. 3d 536, 541, 560 N.E.2d 482, 485-86, this court again addressed the propriety of the frisk of a driver stopped for a traffic offense and wrote the following:

"The mere fact that defendant was stopped for a traffic offense does not necessarily afford a reasonable basis for believing defendant was armed and dangerous. [Citations.] *** [T]he right to frisk does not automatically follow the right to stop. The test for determining the validity of the frisk is an objective one, but even though the police officer's subjective feelings do not establish the validity of the frisk, testimony of the officer's feelings is a factor to consider within the totality of circumstances known to the officer at the time. [Citation.] 'In determining the reasonableness of the officers' conduct, the facts must be considered not from the perspective of analytical hindsight, but rather as they would have been viewed by a reasonable officer confronting them in the performance of his duties.' [Citation.] Considering the time of day the defendant's car was stopped, the location of the stop, defendant exited his vehicle without being told to do so and approached the squad car, [the State Trooper] was alone, there were three other occupants in defendant's vehicle, and one of those occupants made a movement inside the car which might be interpreted as reaching for a weapon under the seat or on the floor of the car, the officer was justified in taking charge of the situation for his own protection and frisking the defendant to ensure he (the officer)

was not in danger. The officer testified he felt his safety might be in jeopardy if he did not take charge of the situation."

Based on the foregoing authority, we are satisfied that the concerns expressed by Brainard about the possibility of defendant's possessing a weapon were sufficient to justify Brainard's pat-down of defendant. In so holding, we note that based upon the authority of *Stout* and *Houldridge,* Brainard arguably possessed probable cause to search the interior of the car and its occupants based upon the smell of burning cocaine he detected coming from the car's interior. However, on these facts, we need not address whether Brainard could have lawfully conducted such a search; all we need address here is whether Brainard had sufficient justification—a far lesser standard— to conduct a pat-down of defendant. We hold that he did.

### D. *Did the Deputy Lawfully Remove the Cigarette Flip-Top Box From Defendant's Person As a Result of the Pat-Down and Examine It?*

Brainard testified that when he patted defendant down, he came upon a cigarette flip-top box in defendant's waistband and a hard object in the crotch of defendant's pants. Brainard believed the hard object he felt in defendant's crotch area felt large enough to be a knife or a gun. Brainard then put his thumb inside defendant's waistband to feel what the bulge was and pulled out a Marlboro cigarette flip-top box. Brainard thought it unusual for defendant to carry the cigarette box in that area.

Professor Wayne LaFave has addressed the law governing police actions when conducting pat-downs and has written the following:

"Under the better view *** a search is not permissible when the object felt is soft in nature. If the object felt is hard, then the question is whether its 'size or density' is such that it might be a weapon. But because 'weapons are not always of an easily discernible shape,' it is not inevitably essential that the officer feel the outline of a pistol or something of that nature. Somewhat more leeway must be allowed upon 'the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' which is most likely to occur when the suspect is wearing heavy clothing. Under this approach, courts have upheld as proper searches which turned up certain objects other than guns, such as a pocket tape recorder, a pipe, a pair of pliers, cigarette lighter, several keys taped together, or a prescription bottle." 3 W. LaFave, Search & Seizure §9.4(c), at 523 (2d ed. 1987).

■ The record shows that the cigarette flip-top box in this case similarly had "the feeling of a hard object of substantial size." We therefore hold that Brainard was justified in removing it from defendant's waistband once he detected it. In so holding, we reaffirm the following observations this court made in *Day*:

> "The courts of Illinois have frequently noted that objects which are not *per se* deadly weapons may be used in such a manner as to become deadly weapons. [Citations.] The need to stop and frisk is a practical decision, and courts should not place so onerous a test on the sufficiency of the officer's suspicions that the defendant is presently armed and dangerous when the protection of the investigating officer is at stake. The officer need only demonstrate a substantial possibility defendant possessed an instrumentality which could be utilized to commit bodily harm." *Day*, 202 Ill. App. 3d at 544, 560 N.E.2d at 488.

### E. *Did the Deputy Lawfully Open the Cigarette Flip-Top Box He Obtained from Defendant During the Pat-Down To Determine Its Contents?*

Brainard testified that he opened the cigarette flip-top box to look "for weapons," explaining that "[a]nything can be hidden in a cigarette pack." He added the following explanation: "It is unusual to find a cigarette pack shoved in front inside the beltline. It is very unusual. It could have been a razor blade. It could have been anything."

In *Day*, this court approved the police officer's removal of a small package about 1½ inches in length and a quarter inch in thickness that the State Trooper testified "could have been a razor blade wrapped up in something." (*Day*, 202 Ill. App. 3d at 540, 560 N.E.2d at 485.) The trooper then discovered that the object was a small, white envelope, which had a "druggist fold." The trooper then believed, based upon his training, that the envelope was a conveyance used to hold illegal drugs. (*Day*, 202 Ill. App. 3d at 540, 560 N.E.2d at 485.) This court concluded that both the removal of the item from defendant's clothing and its subsequent unwrapping and inspection by the trooper were lawful. *Day*, 202 Ill. App. 3d at 544-46, 560 N.E.2d at 488-89.

■ In *Ricksy* (206 Ill. App. 3d at 309, 564 N.E.2d at 261), this court held that an officer conducting a pat-down must believe the object felt during the pat-down might be some kind of weapon. We further held that "[s]imple curiosity is not a sufficient basis to justify the removal of such an object from a person's clothing." (*Ricksy*, 206 Ill.

App. 3d at 309, 564 N.E.2d at 261.) In the present case, however, Brainard testified explicitly about his fear that the item he felt might be a weapon. Accordingly, on these facts, he was justified in removing the cigarette flip-top box and examining its contents. Thus, he lawfully seized the cellophane bag found therein that contained the substance that later tested to be a substance containing cocaine. Accordingly, the trial court erred in granting defendant's motion to suppress that substance.

### F. *Standard of Review*

■ We are fully aware of our limitations as a court of review when addressing challenges a party makes to a trial court's ruling on a motion to suppress. In *Sorrells* (209 Ill. App. 3d at 1068, 568 N.E.2d at 499), this court wrote that "[a] reviewing court will not disturb a trial court's ruling on a motion to suppress unless it is manifestly erroneous." (See also *People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299, 303.) However, in the present case, we conclude that the trial court's order suppressing evidence was manifestly erroneous. We do so in part because the trial court never correctly stated the issues it had to resolve. As we reviewed this record, we had difficulty determining precisely what findings of fact and conclusions of law the trial court made. We earlier referred to several areas of search and seizure law discussed by the court that are irrelevant to the issues on appeal. We suggest again the analytical approach set forth in *Ricksy* (206 Ill. App. 3d at 306-07, 564 N.E.2d at 259), and observe that a trial court's use of that approach will assist courts of review in giving the deference the law requires (and that the courts of review would like to give) to the trial court's findings of fact and conclusions of law.

### III. CONCLUSION

For the reasons stated, we reverse the order of the circuit court suppressing the evidence of the substance containing cocaine and remand for further proceedings.

*Reversed and remanded.*

McCULLOUGH and KNECHT, JJ., concur.