**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2603-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DARYL M. WILLIAMS,

     Defendant-Appellant.

_____

Argued October 30, 2025 – Decided January 16, 2026

Before Judges Mawla and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment Nos. 22-03-0400 and 22-06-1009.

Andrew Kirschenbaum argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Laura B. Lasota, Deputy Public Defender II, of counsel and on the briefs; Andrew Kirschenbaum, Designated Counsel, appearing pursuant to Rule 1:21-3(c), on the briefs).

Alexandra E. Harrigan, Assistant Prosecutor, argued the cause for respondent (Raymond S. Santiago,

Monmouth County Prosecutor, attorney; Alexandra E. Harrigan, of counsel and on the brief).

PER CURIAM

Following his guilty plea and conviction for second-degree unlawful possession of a weapon and third-degree possession of a controlled dangerous substance (CDS), defendant Daryl M. Williams appeals from the February 3, 2023 Law Division order denying his motion to suppress evidence.[1]  We affirm.

## I.

The following facts were elicited during the testimonial hearing on the motion to suppress.  Asbury Park Patrolman Alexander Parisi was on patrol in his vehicle at approximately 2:15 a.m. on October 2, 2021.  There were two shootings in the preceding three hours, and the suspects were still at large.

Two blocks from the shootings, Officer Parisi observed a car make an abrupt "last-second turn" onto a one-way street.  He thought "there was something off about it" because "[i]t didn't look like it was natural.  It didn't look like they were planning on turning onto [the one-way street].  It looked like they may have been trying to avoid crossing in front of" the officer's vehicle.

---

[1]  Although listed in his notice of appeal, defendant's conviction and sentence in Indictment No. 22-06-1009 is not at issue.

The officer activated his body-worn camera (BWC) and mobile video recorder (MVR) and followed the car.

After turning down the one-way street, Officer Parisi observed two vehicles, a white Kia sport utility vehicle (SUV) and a black Mustang, parked on the side of the road. Without activating his lights or siren, he slowed down as he approached the cars and observed the occupants exit the vehicles.

Officer Parisi immediately recognized one of the Kia's passengers as Daniel Mack, whom he had encountered previously. Officer Parisi knew Mack had an active warrant for an eluding charge. After a brief, congenial conversation with Mack, the officer proceeded on his patrol. When asked why he did not arrest Mack on the warrant, Officer Parisi explained he "was outnumbered" and "it was just a safety thing[,] . . . knowing . . . his criminal history and eluding, there was a really high possibility that he was going to run." He decided to circle the block and return with other officers.

Officer Parisi radioed other officers to set up a perimeter, but when he returned to where the vehicles had been parked, they were gone. He immediately proceeded to a nearby apartment complex Mack frequented. Upon arrival, Officer Parisi observed a white Kia SUV idling in a parking lot where Mack typically parked. He turned into the parking lot and, as he drove past the Kia, observed "a lot of movement in the back seats." He executed a k-turn and

pulled up adjacent to the Kia with his headlights facing the vehicle's rear passenger side.

Although he had radioed for backup officers, Officer Parisi was initially the only officer on the scene. He was concerned for his safety based on the shootings and the unknown number of passengers in the vehicle. As he exited his vehicle and approached the Kia from the rear, he "could see movement in the back" and "the rear seat passenger shifting forward."

At that point, Officer Parisi did not consider the encounter a motor vehicle stop. He testified: "It wasn't a stop. I didn't have my lights activated. . . . I didn't block [the car] in." Had it been a stop, he "would have [turned] on the lights" and "actually parked [his] vehicle so that they couldn't back out and leave. . . . [T]hey were actually free to go." However, Officer Lorenzo Pettway arrived and parked his patrol vehicle in the middle of the parking lot between the Kia and the entrance, largely blocking the exit.

As he approached the vehicle on foot, Officer Parisi saw the rear seat occupant "jerking forward." He greeted the front seat passenger and driver but could not determine if Mack was inside, so he shined his flashlight through the windows to identify who was in the car. Having previously arrested them for CDS offenses, Parisi recognized the rear-seat occupants as Tyheim McGhee, seated in the rear passenger's side, and defendant, seated in the rear driver's side.

Although he confirmed Mack was not in the vehicle, the passengers' movements, combined with the recent shootings in the area, gave the officer "a heightened concern" for his safety.

When Officer Parisi shined the light on him, McGhee "sat frozen" with wide eyes, while defendant was moving around and reaching toward the floorboard. Officer Pettway, who had exited his vehicle and approached the driver's side of the Kia, told defendant to show him his hands.

Because the furtive movements gave Officer Parisi concern for his safety, he ordered McGhee to step out of the car while simultaneously opening the car door. Instead of immediately exiting the vehicle, McGhee "took a long time to exit and he was actually focused on the floorboard." Officer Parisi observed McGhee kick his phone under the front passenger seat and then, while exiting the vehicle, move the fabric of the floorboard "to . . . kind of build a wall over the void under the seat in front of him. So[] that you can't see what's under that seat." McGhee's movements were "a huge red flag because it . . . wasn't normal . . . for somebody to be covering up the seat in front of them."

After McGhee exited the vehicle, Officer Parisi patted him down for weapons. The officer then looked in the back seat of the vehicle and saw a digital scale in the middle of the rear floorboard. Defendant and the other two occupants were also ordered out of the car and patted down, which took some

5

time because defendant did not immediately exit the vehicle and, as the trial court described, the other two occupants were acting unruly.

Officer Parisi then retrieved the scale, which he knew could be used for weighing narcotics. He observed a white powder residue on the scale which, based on his experience, was consistent with powder cocaine residue. Upon questioning, McGhee said the scale was possibly used to weigh marijuana. McGhee did not deny the residue looked like cocaine, "but he said he had nothing to do with weighing cocaine on it."

After consulting with his sergeant, Officer Parisi then called for a K-9 unit to conduct an exterior sniff of the vehicle. When no K-9 response was forthcoming, he decided to search the vehicle so as not to prolong the stop. Officer Parisi believed they had probable cause to conduct the search "based on the drug paraphernalia with the cocaine residue on the scale."

Officer Parisi found an open container of alcohol in the driver's side door. Officer Pettway discovered a knotted clear plastic bag of suspected crack cocaine and CDS paraphernalia in the rear compartment and a loaded semiautomatic handgun under the front passenger seat. All four occupants were placed under arrest. During defendant's search incident to arrest, officers discovered a black scale with white residue similar to the one in the vehicle.

On March 3, 2022, a grand jury returned Indictment No. 22-03-0400, charging defendant with second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); third-degree possession of CDS, N.J.S.A. 2C:35-10(a)(1); fourth-degree possession of a prohibited weapon, N.J.S.A. 2C:39-3(f)(1); and fourth-degree possession of a defaced firearm, N.J.S.A. 2C:39-9(e). In a separate complaint-warrant, defendant was also charged with disorderly persons use or possession with intent to use CDS paraphernalia, N.J.S.A. 2C:36-2(a).

Defendant moved to suppress the CDS and gun recovered from the vehicle, contending the initial stop was unlawful and any subsequent search was unconstitutional. On February 3, 2023, after conducting a testimonial hearing, the trial court issued an oral opinion denying the motion.

The court found Officer Parisi's testimony credible based on his demeanor, responses to questions, and consistency with the MVR and BWC videos. It held the encounter, which began as a field inquiry, became an investigatory stop when Officer Parisi ordered McGhee out of the car. In concluding the officers' actions were objectively reasonable, the court found:

> Officer Parisi was aware that two shootings had just occurred in the area and that the subjects were still at large. He was significantly outnumbered as he approached the vehicle. As he approached, the rear passengers continued to move about in a manner

A-2603-23

inconsistent with a stop from officers. For example, they were not reaching for credentials or identification.

He testified that he saw McGhee moving his feet in a suspicious way. This unusual behavior combined with the fact that [Officer] Parisi was alone gave him an articulable reason to ask the individuals he saw in a furtive manner to alight from the vehicle. It also gave him an articulable reason to describe for the court why he feared for his safety.

After determining the stop was appropriate, the court found the officers had probable cause to search the vehicle, based on the scale with the white residue. Accordingly, the court denied the motion to suppress.

Defendant later pleaded guilty to second-degree unlawful possession of a weapon. He was sentenced to a five-year prison term, subject to the Graves Act, N.J.S.A. 2C:43-6.

On appeal, defendant raises the following arguments:

POINT I

BECAUSE THE SEIZURE OF THE EVIDENCE FROM THE VEHICLE WAS THE DIRECT RESULT OF AN UNLAWFULLY PROLONGED INVESTIGATIVE DETENTION AND ILLEGAL SEARCH, THE EVIDENCE SHOULD HAVE BEEN SUPPRESSED.

A. Officers Detained the White Kia Sorento Looking for Daniel Mack and, Once They Discovered He Was Not Present, Lacked Reasonable Suspicion to Prolong the Detention and Order a Passenger Out of the Vehicle.

1. The Occupants of the White Kia Were Detained From the Moment Officers Obstructed Their Exit From the Parking Lot.

2. [Officer] Parisi Lacked a Valid Basis to Prolong the Detention Once He Knew Daniel Mack Was Not in the Car.

3. The Alleged Furtive Movements Observed by [Officer] Parisi Were Insufficient to Support the Prolonged Detention and the Order for McGhee to Exit the Car.

4. The Court Erred in Concluding that Officer Parisi's Order for McGhee to Exit the Car Did Not Need to be Based on a Reasonable Articulable Suspicion of Criminal Activity.

B. Police Lacked Probable Cause to Search the Vehicle Based on What "Might" Have Been Cocaine Residue on a Scale.

## II.

When reviewing a trial judge's factual findings at a suppression hearing our standard of review is deferential, so long as "those findings are supported by sufficient credible evidence in the record." State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. S.S., 229 N.J. 360, 374 (2017)). The trial judge has the "'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Reece, 222 N.J. 154, 166 (2015) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). "We ordinarily will not

disturb the trial court's factual findings unless they are 'so clearly mistaken "that the interests of justice demand intervention and correction."'" State v. Goldsmith, 251 N.J. 384, 398 (2022) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)). However, no deference is owed to the trial court's application of the law to the facts, which we review de novo. State v. Fenimore, 261 N.J. 364, 373 (2025).

The trial court found the encounter began as a field inquiry, which became an investigatory stop when McGhee was ordered out of the car. On appeal, the State concedes an investigatory stop began when Officer Parisi approached the vehicle, because Officer Pettway's vehicle partially blocked the exit of the parking lot and therefore defendant would not have believed he was free to leave. For sake of completeness, we address both standards.

"A field inquiry 'is a limited form of police investigation that, except for impermissible reasons such as race, may be conducted "without grounds for suspicion."'" State v. Nishina, 175 N.J. 502, 510 (2003) (quoting State v. Rodriguez, 172 N.J. 117, 126 (2002)). "A permissible inquiry occurs when an officer questions a citizen in a conversational manner that is not harassing, overbearing, or accusatory in nature." Ibid.

At the second level of encounters, an investigative stop, also known as a Terry[2] stop-and-frisk, does not require probable cause to believe a person has committed or is about to commit an offense. See id. at 511. Rather, "[a] police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer ha[s] a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity." State v. Stovall, 170 N.J. 346, 356 (2002) (citing Terry, 392 U.S. at 21).

"Although reasonable suspicion is a less demanding standard than probable cause, '[n]either "inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" Goldsmith, 251 N.J. at 399 (quoting Stovall, 170 N.J. at 372 (Coleman, J., concurring in part and dissenting in part)). Rather, reasonable suspicion must arise from the totality of the circumstances "in view of [the] officer's experience and knowledge, taken together with rational inferences drawn from [the] facts." State v. Davis, 104 N.J. 490, 504 (1986).

With these governing standards in mind, we are satisfied the trial court's factual findings are well supported in the record. In addition to Officer Parisi's

---

[2] Terry v. Ohio, 392 U.S. 1 (1968).

credible, detailed testimony, the court had the benefit of viewing the BWC and MVR footage, which depicted the entire encounter.

We need not tarry on whether the encounter began as a field inquiry or an investigative stop because Officer Parisi's approach of the vehicle satisfies either test. Assuming the encounter was an investigative stop, Officer Parisi was justified in approaching the vehicle. As the trial court articulated, he had just encountered Mack, who had a warrant for his arrest, blocks away and minutes earlier in the same vehicle, which was now parked in an area Mack was known to frequent. Thus, he lawfully approached the vehicle to determine whether Mack was an occupant.

Next, we consider whether the officers were justified in ordering the vehicle's occupants, including defendant, out of the vehicle. Under New Jersey's Constitution, police officers can "remove passengers only when the circumstances present reason for heightened caution." State v. Bacome, 228 N.J. 94, 107 (2017). Accordingly, a police officer can "order a passenger out of a vehicle if the officer can 'point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle detained for a traffic violation.'" Id. at 106 (quoting State v. Smith, 134 N.J. 599, 618 (1994)). Contrary to defendant's contention, "furtive movements may satisfy the heightened-caution standard" for an officer to order occupants

out of a vehicle. State v. Carrillo, 469 N.J. Super. 318, 335 (App. Div. 2021) (quoting Bacome, 228 N.J. at 107). An officer need only have a "heightened awareness" of danger based on the totality of the circumstances. Ibid. (quoting Smith, 134 N.J. at 618).

As he approached the vehicle, Officer Parisi became concerned for his safety based on the totality of the circumstances already discussed. Before he could determine whether Mack was present, he observed and became suspicious of the furtive movements. When he shined the flashlight in the rear of the vehicle and confirmed Mack was not an occupant, the furtive movements continued, which further justified his ordering the occupants out of the vehicle.

Contrary to defendant's contention, this situation is not analogous to State v. Williams, 254 N.J. 8 (2023). There, the officer stopped a vehicle after randomly running the license plate and determining the owner, a female, had a suspended license. Id. at 15. Upon approaching the car, the officer observed a male was driving. Ibid. However, the officer "might have smelled marijuana," which led to a canine sniff, search of the vehicle, and discovery of a handgun. Ibid. In ordering the gun suppressed, our Supreme Court held the officer's "uncertain perception of marijuana odor" did not justify the continued detention after the officer determined the driver was not the owner. Id. at 44.

Here, however, the continued detention was based on officer safety, not a weak notion of marijuana use. Officer Parisi articulated the reasons he had a heightened safety concern in approaching the vehicle. The concerning furtive movements preceded and persisted during his confirmation Mack was not in the vehicle; thus, he was justified in taking the necessary steps to ensure his safety. See Bacome, 228 N.J. at 107 ("It would be impractical to require officers to determine whether the movement was to hide a weapon or a box of tissues before taking any precautionary measures. Such a rule would threaten officer safety.").

Our conclusion is not altered by the fact that Officer Parisi opened the door while simultaneously ordering McGhee out of the vehicle. "Suddenly opening a car door is unconstitutionally intrusive because the police officer thereby surprises the occupant when the latter is entitled to consider [their] private affairs secure from outside scrutiny." State v. Woodson, 236 N.J. Super. 537, 540-41 (App. Div. 1989). Thus, an officer's "[o]pening the door sufficiently partakes of an 'exploratory investigation,' State v. Griffin, 84 N.J. Super. 508, 517 (App. Div. 1964), as to constitute a search." Woodson, 236 N.J. Super. at 541. However, as we have previously explained, the officer's safety concerns justified his opening the car door without permission. As in State v. Conquest, there was "no assertion of surprise, sudden action or even lack of warning" here; and Officer Parisi opened the door after he had "spoke[n] to the

driver and observed furtive movement." 243 N.J. Super. 528, 533 (App. Div. 1990).

We next turn to defendant's contention the search was unsupported by probable cause. "Warrantless searches are presumptively unreasonable under both [the federal and state] constitutions." State v. Cohen, 254 N.J. 308, 319 (2023). "[T]o overcome that presumption[,] . . . the State must show by a preponderance of evidence that the search falls within one of the well-recognized exceptions to the warrant requirement." State v. Smart, 253 N.J. 156, 165 (2023). At issue here is the plain view exception, which requires the officer be lawfully "in the area where [they] observed and seized the incriminating item or contraband," and that it is "immediately apparent that the seized item is evidence of a crime." State v. Gonzales, 227 N.J. 77, 101 (2016).

We have already concluded Officer Parisi lawfully opened the car door and was present in the viewing area when he seized the scale. Turning to "the 'immediately apparent' requirement, 'in order to seize evidence in plain view a police officer must have "probable cause to associate the [item] with criminal activity."'" State v. Harris, 457 N.J. Super. 34, 45 (App. Div. 2018) (alteration in original) (quoting State v. Mann, 203 N.J. 328, 341 (2010)). When making this determination, the court should look to "what the police officer reasonably knew at the time of the seizure." State v. Johnson, 171 N.J. 192, 213 (2002)

(quoting State v. Bruzzese, 94 N.J. 210, 237 (1983), overruled on other grounds by, Gonzales, 227 N.J. at 101). All that is necessary "to meet [this] requirement is '[a] practical, nontechnical' probability that incriminating evidence is involved." State v. Reininger, 430 N.J. Super. 517, 536 (App. Div. 2013) (second alteration in original) (quoting Bruzzese, 94 N.J. at 237).

We reject defendant's assertion the search was based only on a "mere hunch." The scale was covered in a white powder, which Officer Parisi knew to be consistent with cocaine residue. This reasonable, articulable suspicion was based on the officer's knowledge that the back seat occupants, including defendant, were previously arrested for CDS offenses, as well as his experience with CDS-related cases. Combined, this constitutes a practical, nontechnical probability that the scale was incriminating evidence of a crime.

Lastly, we note that requiring law enforcement to obtain a warrant during a stop will often be more intrusive to the occupants than a brief warrantless search. See State v. Witt, 223 N.J. 409, 446 (2015) ("When a police officer has probable cause to search a car, is a motorist better off being detained on the side of the road for an hour . . . or having [the] car towed and impounded at headquarters while the police secure a warrant?"). Here, the officer had probable cause to search the vehicle. He could have waited for an undetermined amount of time for the K-9 unit's response, or could have impounded the vehicle

and obtained a search warrant, either of which would have been more intrusive and burdensome to the driver and occupants.  Thus, we are satisfied the search was reasonable under the circumstances.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2603-23