NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3734-12T1

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

  v.

TAWIAN BACOME,

      Defendant-Appellant.

---

> **APPROVED FOR PUBLICATION**
>
> **April 16, 2015**
>
> **APPELLATE DIVISION**

Submitted September 23, 2014 — Remanded October 17, 2014
Argued March 24, 2015 - Decided April 16, 2015

Before Judges Fisher, Nugent and Accurso.

On appeal from the Superior Court of New
Jersey, Law Division, Middlesex County,
Indictment No. 11-08-1221.

Jacqueline E. Turner, Assistant Deputy
Public Defender, argued the cause for
appellant (Joseph E. Krakora, Public
Defender, attorney; Ms. Turner, on the
brief).

Frank Muroski, Deputy Attorney General,
argued the cause for respondent (John J.
Hoffman, Acting Attorney General, attorney;
Mr. Muroski, of counsel and on the brief).

The opinion of the court was delivered by

FISHER, P.J.A.D.

After the denial of his suppression motion, defendant pleaded guilty to a drug possession offense and was sentenced to a three-year prison term. In this appeal, defendant argues only that the trial judge erred in denying his motion to suppress evidence seized during a warrantless search of the motor vehicle he was operating. We conclude — on the pivotal question — that police lacked a reasonable and articulable basis for ordering defendant's passenger out of the vehicle and reverse the order denying suppression.[1]

I

At the suppression hearing, the State's only witness was Woodbridge Detective Brian Jaremczak. He testified that, at approximately 4:30 p.m., on April 29, 2011, he and his partner, Detective Patrick Harris, observed defendant operating a Ford Bronco; S.R., the owner of the vehicle, was in the front passenger seat. The detective testified he was "very aware" of S.R. and "had just recently heard about" defendant; he believed

---

[1] We first heard this appeal earlier in the term. By way of an unpublished opinion (hereafter Bacome I) filed on October 17, 2014, we remanded for additional findings, which the trial judge promptly provided. This circumstance provides a valid basis for our citing and quoting Bacome I even though it was unpublished. See State v. W. World, Inc., __ N.J. Super. __, __ n.1 (App. Div. 2015) (slip op. at 3 n.1); Badiali v. N.J. Mfrs. Ins. Grp., 429 N.J. Super. 121, 126 n.4 (App. Div. 2012), aff'd, __ N.J. __ (2015).

they were "narcotic users and narcotic dealers" because the police department had received "information from concerned citizens" about "a lot of traffic coming and going from [defendant's] apartment."

The detectives, driving an unmarked vehicle, followed defendant's Ford Bronco out of Woodbridge and onto Routes 1 and 9, heading toward Newark; they eventually lost the Bronco on Frelinghuysen Avenue. Suspecting defendant and S.R. "were going to purchase narcotics" and "would be back very shortly," the detectives drove to Woodbridge and awaited the Bronco's return.

At approximately 5:30 p.m., while waiting on the border of Woodbridge and Rahway, Detective Jaremczak observed the Bronco traveling south on Routes 1 and 9. When asked what happened next, the detective testified that "we" observed S.R. "wasn't wearing his seatbelt." They activated their vehicle's emergency lights and directed the Bronco to stop.

Detective Jaremczak approached the passenger side, and his partner approached the driver's side. When asked whether he "notice[d] any movement by either" occupant, Detective Jaremczak responded that "[his] partner did," and that his partner "saw [defendant] reaching forward . . . like, reaching under his seat." Defense counsel immediately objected because the witness lacked personal knowledge. The judge made no ruling but only

asked the witness whether he observed defendant's movement, and Detective Jaremczak responded "no." In answer to the prosecutor's next question, the detective explained he was "focused on" S.R., confirming he did not see defendant's alleged furtive movement. The detective testified his partner asked defendant to exit the vehicle, and he directed S.R. out of the vehicle. Both occupants complied.

The detectives separately questioned the occupants, who gave different responses to where they were coming from, which, according to the witness, "further heighten[ed] [their] suspicion as to what occurred." During his questioning of S.R., Detective Jaremczak noticed "a rolled up piece of paper[,] which was in the shape of a straw[,] [a]nd a piece of Chore Boy Brillo" "near the front of the middle console." He testified that, in his experience, "[t]he straw can be used to snort narcotics," and the other item "is used, pretty much, as a filter in a crack pipe." As a result of these observations, Detective Jaremczak requested and obtained S.R.'s consent to search the vehicle. The detective read him the consent form; to him, S.R. did not "appear to be under the influence of any narcotics or drugs" and appeared to understand the consent form that he signed.

In the search of the vehicle that followed, the officers seized the straw and scrubber observed in "plain view," as well as "blunt wrappers," "a used crack pipe inside of a Maverick cigarette pack," "[a] larger piece of Chore Boy copper scrubber," and "[thirteen] vials of crack cocaine in a Newport cigarette pack."

Although during direct examination the detective testified only that "we" observed S.R. was not wearing a seatbelt, when cross-examined he testified that he observed it, although he could not remember any details and did not issue a summons for that alleged violation. When pressed, Detective Jaremczak acknowledged there were actually two reasons for the motor vehicle stop: (1) S.R. was not wearing a seatbelt, and (2) he "believe[d] that they just went to Newark to purchase narcotics." The detective also agreed the observations of the straw and scrubber were not made until after S.R. stepped out of the vehicle as commanded:

> Q. Did you see [those items] through the windshield or through the side [window]?
>
> A. Once he got out; the door was opened; and that's when I s[aw] it.
>
> Q. How did he get out?
>
> A. I asked him out.
>
> . . . .

Q. So you ordered him out of the car because you were conducting what kind of investigation?

A. I asked him out of the vehicle. And at that time it became a narcotic investigation.

Q. Isn't it true that it already was a narcotics investigation before [defendant] was ordered out of the car?

A. Yeah. I did believe that they went to Newark to purchase narcotics.

During direct examination, the prosecutor elicited testimony from the detective that the consent form for the search was executed at 5:55 p.m. The defense demonstrated during cross-examination, through use of a video taken from another police vehicle, that the detective was likely in error about the timing of consent.

As can be seen, Detective Jaremczak did not have personal knowledge of part of the circumstances that ostensibly justified the warrantless search. He did not see defendant reach under the seat; Detective Jaremczak testified only that Detective Harris said he observed this. When asked where Detective Harris was the day of the hearing, Detective Jaremczak said Harris was home and not expected to appear at the hearing.

No one else testified.

A week after the hearing, the trial judge rendered an oral decision, in which he found: the observation of S.R. not wearing a seatbelt gave the detectives a lawful reason for stopping the vehicle; defendant's reaching under his seat gave the detectives a reasonable suspicion of criminal activity and authorized their directions that defendant and S.R. exit the vehicle; once S.R. was out of the vehicle, drug paraphernalia was seen in plain view; and S.R. thereafter freely and voluntarily gave his consent to the vehicle search, resulting in the seizure of thirteen vials of crack cocaine. For these reasons, the judge denied the motion to suppress.

Defendant later pleaded guilty to third-degree possession of a controlled dangerous substance, N.J.S.A. 2C:35-10(a)(1), and was sentenced to a three-year prison term.

III

In this appeal, defendant argues only that the judge erred in denying his suppression motion because the officers "did not have cause to order [S.R.] from the car." Accordingly, we need not question the legitimacy of the vehicle stop,[2] notwithstanding

---

[2] See Delaware v. Prouse, 440 U.S. 648, 663, 99 S. Ct. 1391, 1401, 59 L. Ed. 2d 660, 673 (1979); State v. Locurto, 157 N.J. 463,
(continued)

the officers' overarching desire to conduct a narcotics investigation in the absence of reasonable suspicion to support that undertaking.[3]  In addition, there is no dispute about the observations of drug paraphernalia in plain sight once S.R. was ordered out of the vehicle.  And the voluntariness of the consent given for the search that followed has not been questioned.  Consequently, this appeal rises and falls on whether S.R. was lawfully ordered out of the vehicle because, without that link in the chain of events, the evidence thereafter seized would have to be excluded.[4]

---

(continued)
470 (1999); State v. Moss, 277 N.J. Super. 545, 547 (App. Div. 1994).

[3]See State v. Kennedy, 247 N.J. Super. 21, 28 (App. Div. 1991) (holding that "courts will not inquire into the motivation of a police officer whose stop of an automobile is based upon a traffic violation committed in his presence").

[4]We reject the State's contention, based on State v. Robinson, 200 N.J. 1, 18-19 (2009), that we should not consider this argument because defendant failed to pose this precise question in the trial court.  Robinson involved a pretrial application as to which the defendant was saddled with the burden of proof. Here, the opposite is true; defendant moved for the suppression of evidence, and it was the State's burden to prove the admissibility of the fruit of its warrantless search.  State v. Brown, 216 N.J. 508, 517 (2014).  We see no harm to the administration of justice, nor do we discern an inappropriate tilt of the field of the type that prompted the Court's ruling in Robinson.  See 200 N.J. at 19.  Indeed, in adhering to and quoting from an article written by a federal appellate judge, the Robinson Court expressed concern that permitting "late-blooming issues . . . would be an incentive for game-playing by
(continued)

We initially observe that an officer's command that <u>a driver</u> exit a vehicle constitutes a seizure, <u>State v. Smith</u>, 134 <u>N.J.</u> 599, 609 (1994), but a seizure understood to be constitutionally permissible, <u>Pennsylvania v. Mimms</u>, 434 <u>U.S.</u> 106, 111, 98 <u>S. Ct.</u> 330, 333, 54 <u>L. Ed.</u> 2d 331, 337 (1977); <u>Smith</u>, <u>supra</u>, 134 <u>N.J.</u> at 611, and based on the policy determination that police officer safety should prevail over the minimal intrusion on the driver's privacy interest, <u>Mimms</u>, <u>supra</u>, 434 <u>U.S.</u> at 110-11, 98 <u>S. Ct.</u> at 333, 54 <u>L. Ed.</u> 2d at 336-37; <u>Smith</u>, <u>supra</u>, 134 <u>N.J.</u> at 610-11.[5]

In declaring this new federal constitutional principle, the <u>Mimms</u> Court was not clear whether it applied to all occupants of a vehicle. And in cases that followed the Court did not appear

_____

(continued)
counsel." <u>Ibid.</u> We detect no game-playing here. In any event, because the State was not prejudiced by defendant's refinement of his argument about this warrantless search — the State having rested at the hearing before the significance of the evidence was argued — we will consider on its merits the slightly different argument defendant has posed in this appeal.

[5]<u>See also</u> <u>State v. Mai</u>, 202 <u>N.J.</u> 12, 22-23 (2010) (finding no difference in whether an officer orders an occupant out of a vehicle or opens the vehicle door to accomplish the same object).

to confine this rule's application to drivers.[6]  This uncertainty about _Mimms_'s reach was finally swept away in 1997, when the Court held, as a matter of federal constitutional law, that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car" and concluded — despite the passenger's "stronger" "personal liberty interest" than the driver's in that instance — the intrusion remains "minimal"; consequently, the Court held that "an officer making a traffic stop may order _passengers_ to get out of the car pending completion of the stop."  _Maryland v. Wilson_, 519 _U.S._ 408, 413-15, 117 _S. Ct._ 882, 886, 137 _L. Ed._ 2d 41, 47-48 (1997) (emphasis added).  Insofar as defendant relies on federal constitutional principles, there is no merit to his argument that the command that S.R. exit the vehicle was constitutionally prohibited.

---

[6]_Mimms_ had referred to the right of police to order a driver out of a vehicle rightfully detained.  434 _U.S._ at 111, 98 _S. Ct._ at 333, 54 _L. Ed._ 2d at 337.  But questions as to _Mimms_'s scope later arose from _Michigan v. Long_, 463 _U.S._ 1032, 1047-48, 103 _S. Ct._ 3469, 3480, 77 _L. Ed._ 2d 1201, 1218-19 (1983) (emphasis added), where the Court restated the rule as authorizing police to "order _persons_ out of an automobile during a stop for a traffic violation."  And in a concurring opinion in _Rakas v. Illinois_, 439 _U.S._ 128, 155 n.4, 99 _S. Ct._ 421, 436 n.4, 58 _L. Ed._ 2d 387, 409 n.4 (1978) (emphasis added), Justice Powell mentioned that _Mimms_ determined "that _passengers_ in automobiles have no Fourth Amendment right not to be ordered from their vehicle, once a proper stop is made."

Not long before the Court decided <u>Maryland v. Wilson</u>, our Supreme Court considered the application of paragraph 7 of Article I of the New Jersey Constitution to police seizure of a driver or occupant from a vehicle stopped for a traffic violation. The Court concluded in <u>Smith</u> that "as applied <u>to drivers</u>," <u>Mimms</u>'s per se rule passes state constitutional muster. 134 <u>N.J.</u> at 610-11 (emphasis added). Unlike the per se rule that the Court ultimately adopted in <u>Maryland v. Wilson</u>, however, our Supreme Court "decline[d] to extend [<u>Mimms</u>'s] per se rule to passengers," and determined that "an officer must be able to point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle detained for a traffic violation." <u>Smith</u>, <u>supra</u>, 134 <u>N.J.</u> at 618. The Court described the scope of this principle in the following way:

> To support an order to a passenger to alight from a vehicle stopped for a traffic violation, . . . the officer need not point to specific facts that the occupants are "armed and dangerous." Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car.

11                                           A-3734-12T1

[Ibid.]

Although not relevant to this appeal, the Smith Court further noted that to justify a pat-down in this circumstance, the prosecution must satisfy the more stringent requirements of Terry v. Ohio, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889, 909 (1968). See Smith, supra, 134 N.J. at 619.

The Smith Court also observed that, in one respect, "the Terry standard and the standard for ordering a passenger out of a car are the same," rejecting "the proposition that such an intrusion will be justified solely because of an officer's 'hunch.'" Ibid. Instead, "the officer must be able to articulate specific reasons why the person's gestures or other circumstances caused the officer to expect more danger from this traffic stop than from other routine traffic stops." Ibid.

C

In considering these principles and the matter at hand, the record reveals that much of what motivated this stop and investigation was the detectives' assumption that defendant and S.R. were narcotics users or sellers or both. The record contains nothing but rumor and innuendo to support that assertion. Detective Jaremczak testified that this supposition of illegal narcotic activity was based on the department's receipt of citizen complaints about the number of people

12

entering and leaving defendant's residence and by the fact that defendant and S.R. were observed traveling toward Newark. Obviously, these two circumstances do not suggest anything other than a mere "hunch" that defendant and S.R. may have been engaged in buying, using or selling illegal narcotics. The fact that S.R. was alleged not to have been wearing his seatbelt when the detectives observed the vehicle's return to Woodbridge adds nothing to whether either defendant or S.R. "caused the officer to expect more danger from this traffic stop than from other routine traffic stops." Smith, supra, 134 N.J. at 619. S.R.'s failure to wear a seatbelt generated a danger only to himself.

This leaves the assertion that, after the vehicle came to a stop, defendant was seen by Detective Harris "reaching forward . . . reaching under his seat." This event was not observed by Detective Jaremczak, the only witness called by the State to testify at the suppression hearing. Defendant objected to this hearsay testimony, and the judge never adequately responded. Although Detective Harris's absence and the lack of evidence based on personal knowledge on this critical point are troubling, it is understood that, as a general matter, the State may offer evidence at a suppression hearing that would constitute inadmissible hearsay if offered at trial. See e.g., State v. Wright, 431 N.J. Super. 558, 565 n.3 (App. Div. 2013),

13                                                    A-3734-12T1

certif. granted on other grounds, 217 N.J. 283 (2014); N.J.R.E.
101(a)(2)(E).[7]   The weight such testimony should be given,
however, is a matter left to the trial judge as factfinder, with
the prosecution running the risk that the factfinder may draw an

---

[7]The Supreme Court of the United States has rejected the notion
that due process is denied by such a rule, reasoning that "the
interests at stake in a suppression hearing are of a lesser
magnitude than those in the criminal trial itself."   United
States v. Raddatz, 447 U.S. 667, 679, 100 S. Ct. 2406, 2414, 65
L. Ed. 2d 424, 435 (1980).   This, however, is not always true;
in fact, the matter at hand presents one of those many instances
where the denial of a suppression motion leaves the accused
defenseless, inexorably leading to a guilty plea or easy
conviction.   See United States v. Wade, 388 U.S. 218, 235, 87 S.
Ct. 1926, 1937, 18 L. Ed. 2d 1149, 1162 (1967) (recognizing that
"[t]he trial which might determine the accused's fate may well
not be that in the courtroom but that at the pretrial
confrontation"); United States v. Green, 670 F.2d 1148, 1154
(D.C. Cir. 1981) (finding a suppression hearing to be "a
critical stage of the prosecution which affects substantial
rights of an accused person . . . [that] may often determine the
eventual outcome of conviction or acquittal"); Olney v. United
States, 433 F.2d 161, 163 (9th Cir. 1970) (observing that a
suppression hearing may be a critical stage of a prosecution
"particularly in narcotics cases, where the crucial issue may
well be the admissibility of narcotics allegedly found in the
possession of the defendant").   Indeed, we are not so quick to
assume the Confrontation Clause may not be violated when the
admission of damning evidence turns on inadmissible hearsay —
frustrating or precluding the accused's right to cross-examine
the absent declarant — because the prosecution decided to
present certain critical facts through a witness who only
received the critical information from someone the State chose
not to call.   See, e.g., Green, supra, 670 F.2d at 1154.
Nevertheless, the understanding our courts have adopted — that
hearsay may be admitted at a suppression hearing without
apparent offense to the Confrontation Clause — has not been
challenged here, so we consider the point no further.

inference adverse to the prosecution's interests when a key fact is supported only by hearsay.[8]

Here, notwithstanding the presentation of this key fact through hearsay testimony, the judge initially made no finding regarding whether there was "some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner." Smith, supra, 134 N.J. at 618. We quote the entirety of the judge's initial decision on this pivotal question:

> While effectuating the stop the detective says he witness[ed] [defendant] reach under the driver's seat.[9] He — they don't say — they don't call — movements nowadays. Because they know that's not good language. But, basically, that's what he's saying. Seen some — movements under the driver seat.
>
> In a totality of the circumstances analysis does the officer have a reasonable and articula[ble] suspicion to believe that criminal activity is afoot? All right. So he removes the defendants [sic] from the vehicle to speak with them.
>
> [Emphasis added.]

---

[8]There was no showing that Detective Harris was unavailable; to the contrary, Detective Jaremczak testified Detective Harris was home at the time of the hearing. The judge drew no adverse inference.

[9]Again, the testifying detective did not witness this; his partner allegedly did.

The judge did not thereafter address this question again in his initial decision, but instead turned to what he found the officers saw in plain sight once the occupants were removed from the vehicle, and then to the events that followed the plain-view observations.

D

In our earlier opinion we concluded that the judge's findings did not adequately address the permissibility of ordering S.R. from the vehicle.

First, we previously stated that

> even if we liberally interpret the judge's comments to suggest that the "movement[] under the driver seat" was found to be "some fact" that would "create . . . a heightened awareness of danger," the judge did not explain how the driver's movement suggested the passenger posed a danger.
>
> [Bacome I, supra, slip op. at 15-16.]

In a footnote in our earlier opinion, we observed that

> in such an instance, the prosecution should be expected to present evidence of a reasonable and articulable suspicion that a weapon was under the driver's seat and the passenger was capable of reaching it while remaining seated in the vehicle. Here, there was no testimony that the Bronco's console did not constitute an obstacle to the passenger reaching under the driver's seat, or that the officer on the passenger's side of the vehicle was not capable of keeping watch over the passenger or prevent

16

> him from reaching under the driver's seat, without unnecessarily intruding on the passenger's privacy by removing him from the vehicle.
>
> [Id. at 16 n.9.]

These alleged circumstances may have been a reason for ordering defendant out of the vehicle, but the judge originally did not explain why defendant's movement suggested S.R. posed a danger.

Second, the "fact" that triggered the order that the passenger exit the vehicle had to be considered in light of "the totality of the circumstances." Smith, supra, 134 N.J. at 618. The mere fact that the vehicle's occupants were traveling to and from Newark, or the fact that defendant received many visitors at his residence, did not suggest a danger was posed when the vehicle was stopped for a seatbelt violation. Certainly, not every driver entering or leaving Newark may be assumed to be a drug user or drug dealer. Nor, even were this so, would it suggest the occupants posed a risk for the officers. In our earlier opinion, we directed "[t]he judge to discuss further whether and — if so — how these circumstances supported the removal of [S.R.] from the vehicle." Bacome I, supra, slip op. at 16.

Third, in his earlier decision, the judge considered only whether defendant's movement under the driver's seat provided a reasonable and articulable suspicion "that criminal activity is

afoot" (emphasis added). That was not the right question. The "fact or facts" to which the officer alludes must "create . . . a heightened awareness of danger." Smith, supra, 134 N.J. at 618 (emphasis added). Accordingly, we previously held in this case:

> No matter how broadly we may interpret the judge's comments, we cannot locate in his opinion a finding that defendant's alleged movement would have suggested "a heightened awareness of danger." We are not splitting hairs in focusing so closely on the judge's precise words; it is all we have to consider. An officer's limited right to order a passenger out of a vehicle arises from the policy determinations made by the Courts in Mimms and Smith that officer safety — not the investigation of criminal activity — overrides the minor intrusion into the passenger's privacy right.
>
> [Bacome I, supra, slip op. at 17.]

And fourth, we previously concluded that the judge's posing of this incorrect question of whether the officer had "a reasonable and articul[able] suspicion to believe that criminal activity is afoot," followed by his answer — "All right" — did not sufficiently convey the substance of his findings. Even if that was the correct question, it was not clear whether "All right" was intended as the means of expressing a finding that the officers did have a reasonable and articulable suspicion of "criminal activity [being] afoot."

As a result, we concluded that "[a]lthough we are required to defer to a trial judge's factual findings on a motion to suppress, State v. Elders, 192 N.J. 224, 254 (2007), the factfinding on the critical issue that this appeal poses does not command our deference. The judge clearly posed the wrong question and then gave no clear answer." Bacome I, supra, slip op. at 17. We, thus, remanded for further findings.

IV

By way of a brief written decision,[10] the trial judge responded to the questions posed in Bacome I. Based on the same evidence, the judge drew the factual conclusion that the movement of the driver — a fact before the court only by way of hearsay that would be inadmissible at trial — suggested the passenger posed a danger. The judge described these conclusions by employing a series of double negatives and by delineating what it was that the record did not reveal:

> • If the [d]efendant put a weapon under his seat, there is nothing to suggest that S.R. would have been unable to reach or gain access to it while remaining seated in the vehicle.

_____

[10]We provided the parties with an opportunity to file supplemental briefs. Defendant provided a brief, the Acting Attorney General declined the invitation.

• <u>there was no indication</u> that the vehicle's center console constituted an obstacle to S.R. reaching under the [d]efendant's seat.

• <u>there was also no testimony</u> that the officer who was standing on the passenger side of the vehicle was not capable of keeping watch over S.R. so as to prevent him from reaching under the [d]efendant's seat.

[Emphasis added.]

In other words, based on that which was not explained by the factual record, the judge determined that in light of "the danger inherent in motor vehicle stops" and the "totality of the circumstances," the driver's movement under his seat was a "specific and articulable fact" that would create a "heightened awareness of danger." The judge added that because the officers were surveilling defendant and S.R. for drug activity, and because they were "suspected of having made a drug run to Newark just prior to the traffic stop," it was not unreasonable "for the officers to believe" that defendant "did indeed place a weapon under his seat," and, for that additional reason, the order that both individuals exit the vehicle "was necessary to secure the scene in a more effective manner." Based on these suppositions, the judge concluded that the ordering of both defendant and S.R. from the vehicle was warranted.

What is lost in this blizzard of double negatives and speculative findings is that it was the State's burden to

justify this warrantless search. Brown, supra, 216 N.J. at 517. "A search conducted without a warrant is presumptively invalid, and the burden falls on the State to demonstrate that the search is justified by one of the 'few specifically established and well-delineated exceptions' to the warrant requirement." State v. Frankel, 179 N.J. 586, 598 (2004). Contrary to the trial judge's determination, the absence of adequate evidence is detrimental to the State's position, not defendant's.

The record unmistakably compels our agreement with the judge's determination that there was an absence of proof on these critical questions. No officer testified to a heightened safety concern. No officer testified S.R. was capable of reaching under defendant's seat if he remained seated in the passenger seat. No officer described the interior of the vehicle at all, let alone with enough concrete details from which an inference could be drawn that S.R. posed a danger if he remained in the passenger seat while being watched by an armed police officer. Absent findings that S.R. remaining in the vehicle created "a heightened awareness of danger," Smith, supra, 134 N.J. at 618, the State could not sustain its burden of proof on this motion.

As we have already demonstrated, the mere fact that the vehicle traveled to and returned from the Newark area adds

21                                                            A-3734-12T1

nothing to the circumstances. And the basis for the stop itself — S.R.'s unbuckled seatbelt — was not ground alone for ordering either individual out of the vehicle.[11] If that was the only legitimate basis for the stop in this case — and it was — then

_____

[11]Although the principles governing appellate review generally require deference to a trial judge's fact findings, they do not require a surrender of our common sense or the adoption of a standard of credulity. See United States v. City of Jackson, 318 F.2d 1, 5 (5th Cir. 1963). We are not being unduly cynical in concluding what is plainly apparent: the unbuckled seatbelt was a ruse for the stop and the officers were interested only in pursuing their hunch — concededly accurate — that the vehicle's occupants were involved in illegal drug activity. Why else did the officers remain on the outskirts of Woodbridge awaiting the vehicle's return from the Newark area? Are we to believe they remained there for no other purpose but to ensure S.R. was wearing his seatbelt on the return trip? Our dissenting colleague emphasizes that in Smith it was the driver — not the passenger — who "engaged in the culpable conduct that result[ed] in the vehicle stop," 134 N.J. at 615, and because the opposite is true here — S.R.'s unbuckled seatbelt generated the stop — that S.R. cannot claim the same liberty interest possessed by the passenger in Smith. Even if we accept the premise that the unbuckled seatbelt was a legitimate ground for stopping the vehicle, our colleague gives too much weight to S.R.'s "culpability" in this chain of events. The record demonstrates the officers were unconcerned about the seatbelt and, more importantly, the unbuckled seatbelt posed them no danger. We do not depart from the letter or spirit of the applicable standard of appellate review, nor the principles enunciated in Smith, in concluding that the State failed to demonstrate a basis for overriding S.R.'s liberty interest in remaining in the vehicle. Just as a fluidity of events may transform an unlawful investigatory stop into a lawful search, State v. Williams, 192 N.J. 1, 10-11 (2007), the opposite can be true, and the lack of a link between the unbuckled seatbelt and the order given S.R. to exit the vehicle transformed what may have been a lawful stop into an unlawful deprivation of S.R.'s liberty interests.

S.R. should have been served with a summons and he and defendant permitted to go on their way.

The order that S.R. exit the vehicle was impermissible and — because it was the linchpin for all that followed — defendant's motion to suppress what was thereafter discovered and seized should have been granted.[12]

V

The order denying defendant's suppression motion is reversed, the judgment of conviction vacated, and the matter remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[12]We lastly note that the State has argued defendant lacked the requisite expectation of privacy to assert the infringement of S.R.'s liberty interest, citing State v. Hinton, 216 N.J. 211 (2013). In Hinton, the Court recognized that the defendant had standing to argue but ultimately did not possess a reasonable expectation of privacy in an apartment he shared with his mother for six years because he had been "served with official notice that a court officer would soon enter the premises and repossess it on the landlord's behalf." Id. at 216. In reaching that conclusion, the Court emphasized it was dealing with a "novel case" that arose "in unusual circumstances." Id. at 236. We, therefore, reject the argument that Hinton has any bearing on the significantly different circumstances presented here.

**NUGENT, J.A.D., dissenting.**

I agree with the majority that "this appeal rises and falls on whether S.R. was lawfully ordered out of the vehicle because, without that link in the chain of events, the evidence thereafter seized would have to be excluded." Ante at ___ (slip op. at 8). Unlike the majority, however, I find that Detective Jaremczak lawfully ordered the passenger, S.R., to exit the vehicle. In my view, the detective violated neither the Federal nor the State Constitution by ordering S.R. to exit the Bronco.

Detective Jaremczak's testimony at the suppression hearing established, indisputably, that when the detectives stopped the Bronco they believed defendant and S.R. had purchased drugs in Newark. The detectives did not stop the Bronco, however, until they observed that S.R. was not wearing a seatbelt. When Detective Jaremczak was questioned on cross-examination about his motive for ordering S.R. out of the car, the following exchange took place:

> A. Once [the passenger] got out; the door was opened; and that's when I seen [the straw and scrubber].
>
> Q. How did he get out?
>
> A. I asked him out.
>
> Q. Why did you ask him out?

A. Just so that I could bring him back to the car. Because my partner was speaking with [defendant]. It's just easier if both us - - if they're both watched at the same time in case one of them wanted to act.

Q. So you ordered him out of the car because you were conducting what kind of investigation?

A. I asked him out of the vehicle. And at that time it became a narcotic investigation.

Q. Isn't it true that it already was a narcotics investigation before [defendant] was ordered out of the car?

A. Yes. I did believe that they went to Newark to purchase narcotics.

Q. Who opened the door?

A. He would have.

The critical issue we must decide is whether Detective Jaremczak's order to S.R. to get out of the car was reasonable. See State v. Smith, 134 N.J. 599, 609 (1994).

> Ordering a person out of a car constitutes a seizure of the Fourth Amendment because the person's liberty has been restricted. See State v. Davis, 104 N.J. 490, 498 (1986) (citing Terry [v. Ohio, 392 U.S. 1, 16, 88 S. Ct. 1868, 1877, 20 L. Ed. 2d 889, 903 (1968)]). Whether such a seizure is constitutional depends on the reasonableness of the order.
>
> [Ibid.]

Under a Fourth Amendment analysis, it is reasonable for an officer to order a driver and passenger out of the car after the

2

officer has pulled the driver over for a traffic offense. In Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 333, 54 L. Ed. 2d 331, 337 (1977), the Supreme Court held that even in the absence of furtive movements or evidence of criminal activity, a police officer had the right to demand that a driver stopped for a traffic violation exit the vehicle. Because "[t]he police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing alongside it." Ibid. Balancing the driver's liberty interest against the State's interest in protecting its police officers, the Supreme Court struck the balance in favor of the latter, finding that the intrusion on the driver's liberty interest in such circumstances to be de minimis. Ibid. The Court extended the rationale in Mimms to a vehicle's passengers in Maryland v. Wilson, 519 U.S. 408, 414-15, 117 S. Ct. 882, 886, 137 L. Ed. 2d 41, 48 (1997).

Our Supreme Court has followed Mimms with respect to drivers, but not passengers; at least passengers not involved in the culpable conduct leading to the traffic stop:

> Although the per se rule under Mimms permits an officer to order the driver out of a vehicle incident to a lawful stop for a traffic violation, we decline to extend that per se rule to passengers. Instead, we determine that an officer must be able to

point to specific and articulable facts that would warrant heightened caution to justify ordering the occupants to step out of a vehicle detained for a traffic violation.

[Smith, supra, 134 N.J. at 618.]

The Supreme Court explained in Smith that a standard, lesser than the Terry standard, is required for officers to order passengers to exit a vehicle. Significantly, however, Smith did not involve culpable conduct on the part of a passenger. In explaining the rationale for its decision in Smith, the Court stated:

Ordering a passenger to leave the vehicle is distinguishable from ordering the driver to get out of the vehicle because the passenger has not engaged in the culpable conduct that resulted in the vehicle's stop. Although the State's interest in safety remains the same whether the driver or the passenger is involved, requiring a passenger to alight from a car in the course of a routine traffic stop represents a greater intrusion on a passenger's liberty than the same requirement does on a driver's liberty. With respect to the passenger, the only justification for the intrusion on the passenger's privacy is the untimely association with the driver on the day the driver is observed committing a traffic violation. Because the passenger has not engaged in culpable conduct, the passenger has a legitimate expectation that no further inconvenience will be occasioned by any intrusions beyond the delay caused by the lawful stop. The intrusion on the passenger's privacy, therefore, is greater than it is on the driver's privacy.

[Id. at 615 (emphasis added).]

4  A-3734-12T1

Unlike the passenger in Smith, here S.R. engaged in the "culpable conduct that resulted in the vehicle's stop." Ibid. Consequently, S.R.'s liberty interest in this case is no different from that of a driver who has committed a traffic violation: "The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of the car or standing alongside it." Mimms, supra, 434 U.S. at 111, 98 S. Ct. at 333, 54 L. Ed. 2d at 337. In my view, that rubric applies equally to culpable passengers, that is, passengers who have committed traffic violations. For that reason, the detectives in the case before us did not violate the protections afforded New Jersey citizens under our State Constitution.

The majority's decision is based in large part upon its observation "that much of what motivated this stop and investigation was the detectives' assumption that defendant and S.R. were narcotics users or sellers or both." Ante at ____ (slip op. at 12). Specifically, the majority states: "We are not being unduly cynical in concluding what is plainly apparent: the unbuckled seat belt was a ruse for the stop and the officers were interested only in pursuing their hunch — concededly accurate — that the vehicle's occupants were involved in illegal drug activity." Ante at ____ (slip op. at 22, n.11). Although

one can debate the meaning of the term "ruse" in this context, it is clear that S.R.'s failure to wear a seatbelt provided the police with probable cause to stop the Bronco. Neither defendant nor S.R. disputed that S.R. was not wearing a seatbelt. Once the lawful traffic stop occurred for that purpose, S.R.'s liberty interest in remaining in the car was outweighed by the State's interest in the safety of its officers. The subjective intent of the officers at that time was not relevant.

In <u>Whren v. United States</u>, 517 <u>U.S.</u> 806, 808, 116 <u>S. Ct.</u> 1769, 1771, 135 <u>L. Ed.</u> 2d 89, 95 (1996), the Supreme Court decided

> whether the temporary detention of a motorist who the police have probable cause to believe has committed a civil traffic violation is inconsistent with the Fourth Amendment's prohibition against unreasonable seizures unless a reasonable officer would have been motivated to stop the car by a desire to enforce the traffic laws.

After reviewing relevant precedent, the Court stated:

> We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the

Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

[Id. at 813, 116 S. Ct. 1774, 135 L. Ed. 2d 89.]

Our Supreme Court has similarly rejected a subjective test when determining whether police officers have acted reasonably for Fourth Amendment purposes. See e.g., State v. Brown, 216 N.J. 508, 531 (2014) (noting that, with respect to whether property had been abandoned, "[t]he test is whether, given the totality of the circumstances, an objectively reasonable police officer would believe the property is abandoned" and that "[t]he subjective belief of the officer is not a relevant consideration, and thus the court should not delve into the murky area of whether an officer acted in good faith or bad faith"); State v. Kennedy, 247 N.J. Super. 21, 27 (App. Div. 1991) ("We begin with the well-recognized principle that generally the proper inquiry for determining the constitutionality of a search and seizure is whether the conduct of the law enforcement officer who undertook the search was objectively reasonable, without regard to his or her underlying motives or intent.") (citations omitted).

Moreover, our Supreme Court has stated:

[O]ur Article I, Paragraph 7 jurisprudence primarily has eschewed any consideration of the subjective motivations of a police

> officer in determining the constitutionality of a search and seizure . . . . [W]e do not believe that the elusive attempt to plumb the subjective motivations of an officer will meaningfully advance either the privacy interests of an individual or the ultimate determination of whether a particular search or seizure was unreasonable under state law.
>
> [State v. Edmonds, 211 N.J. 117, 132-33 (2012) (citations and internal quotation marks omitted).]

In the case before us, Detective Jaremczak's cross-examination does not lead to an entirely unequivocal answer as to whether, when he ordered S.R. out of the car, his motivation was to continue to pursue the seatbelt violation or to pursue the drug investigation or both. What is unequivocal is that he acted for his safety. He testified, explicitly, that he asked S.R. out "[j]ust so that I could bring him back to the car because my partner was speaking with [defendant]. It's just easier if . . . they're both watched at the same time in case one of them wanted to act."

Under the circumstances of this case — where the passenger's liberty expectation to remain in the car was de minimis in view of his seatbelt violation — the State's interest in the safety of its officers prevailed. In the face of federal and State precedent eschewing judicial analysis of law enforcement officers' subjective intentions in such Fourth

Amendment cases, I find no basis for engaging in such analysis here. For that reason, I respectfully dissent.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION